# CHARLESTON.

WELCH PUBLISHING CO. v. JOHNSON REALTY CO. *et al.*

Submitted May 2, 1916.   Decided May 9, 1916.

1.  VENDOR AND PURCHASER—*Construction of Contract—Quantity of Land.*

    An oral contract for the sale of a town lot having a certain number and dimensions fixed by the plat, made by designation of its location, in the absence of the plat, and misdescribing it as regards dimensions, is interpreted as being a sale of the entire lot, not a sale of a portion thereof determinable by the frontage mentioned in the erroneous description by dimensions.   (p. 356).

2.  SAME.

    A town lot, like a farm or a tract of land, is an entity in itself and a description of it as the subject matter of a contract of sale, is not restricted by further descriptive matter merely purporting to give its dimensions, without any intimation of intent to sell less than the entire lot.   (p. 356).

3.  SAME—*Rescission of Contract—Grounds—Mistake.*

    A mistake on the part of the vendor of such a lot, as to its area or dimensions, inducing a sale thereof at a smaller price than he would have asked, had he been cognizant of its size, not in any way occasioned or concealed by conduct of the vendee, constitutes no ground for rescission of the contract, nor does his inadvertant failure to specify a portion of the lot as the subject of sale at the price named.   (p. 357).

4.  SPECIFIC PERFORMANCE—*Contracts Enforceable—Mistake of Vendor.*

    Nor, if he has permitted the vendee to take possession of the lot, partly perform the contract and alter his position, by improvement of the property and location of his business thereon, will such mistake justify refusal of a court of equity to compel specific performance of the contract.   (p. 358).

5.  SAME—*Vendor and Purchaser—Against whom Enforceable—Subsequent Purchaser.*

    One who has purchased land in the possession of another under

an executory contract of sale, either oral or written, takes it sub-
ject to the contractual right of such other person, and, if the
latter has right to have specific performance of the contract by his
vendor, the second purchaser holds the legal title, if he has obtain-
ed it, in trust for the equitable owner and will be required by a
court of equity to convey it to him.   (p. 355).

Error to Circuit Court, McDowell County.

Suit in equity by the Welch Publishing Company against
the Johnson Realty Company and others.   Decree for defend-
ants, and plaintiff brings error.

*Reversed and remanded.*

*Cook, Litz & Harman, Strother, Taylor & Taylor,* and *J. J.
Swope,* for plaintiff in error.

*W. B. Kegley* and *Anderson, Strother, Hughes & Curd,* for
defendants in error.

POFFENBARGER, JUDGE:

The decree complained of dismissed a bill having for its
purpose specific performance of a contract of sale of a cer-
tain lot in the town of Welch, having a frontage on Wyoming
Street of seventy feet, and a cross-bill, or answer in the na-
ture of a cross-bill, having for its purpose enforcement of
specific performance of the same contract for the purchase of
only a portion of said lot, having a frontage of fifty feet on
Wyoming Street, upon the theory of lack of a complete and
enforcible agreement, by reason of failure of the parties to
come to an understanding as to the identity of the subject
matter of the negotiations.   A subsidiary and incidental pur-
pose of the bill was the restraint by injunction of an action
for unlawful entry and detainer instituted by the defendant.
Of course, the injunction was dissolved.   From the decree the
plaintiff has appealed.

The contract, if any, is very informal, and, according to
the plaintiff's contention, altogether verbal, but partly per-
formed.   The lot belonged to the estate of Matthew Mann and
was within a power of sale and disposition conferred upon
the executors and trustees of his will, Isaac T. Mann and Ed-
win Mann.   Though the executors were not cognizant of the

fact, the verbal agreement of purchase,. set up by the plaintiff, was made for it and on its behalf, by H. D. Hatfield, then one of its promoters and later a stockholder. At the date of the agreement, the corporation had not been formed, but was in contemplation. Isaac T. Mann says he dealt only with H. D. Hatfield, and that the corporation was not known in the transaction. They had one or more informal conversations about a site for the office of a newspaper known as the McDowell Recorder, the plant of which had been burned out, some time before the promoters of the corporation by which it was rehabilitated entered into their preliminary agreement. When that agreement was made, the work of procuring the site was delegated to Doctor Hatfield. He as well as his associates had in view a location on one of four lots belonging to the Mann estate and all fronting on Wyoming Street running north and south through the town and in front of the Court House. These four lots, constituting a block with an alley at each end and in the rear, were numbered 4, 5, 6 and 7, from north to south, the last being opposite the corner of the Court House grounds and near the McDowell County National Bank. Both Doctor Hatfield and Isaac T. Mann were connected with that bank, the former being its president and the latter its vice-president. Doctor Hatfield asked I. J. Rhodes, cashier of the bank, to have Mr. Mann put prices on all of the four lots, and the request was made by letter, owing to inability to get in communication by telephone. With the letter,. Mr. Rhodes enclosed a rough pencil diagram of the four lots, made on the back of a deposit slip, and, within the diagram of each lot, he placed the price which had formerly been fixed upon it, $1,000.00 for No. 4, $1,500.00 for No. 5, $1,500.00 for No. 6, and $2,000.00 for No. 7. The letter was dated October 30, 1911 and read in part as follows: "The price that I put on these two lots for you two years ago for this same purpose was an average of $1,500.00 for each fifty foot lot; $2,000.00 for the lot nearest the bank and $1,000.00 for the lot further away and $1,500.00 for the two center lots. I am enclosing herewith a rough pencil sketch of these lots and I think from what the Doctor said this afternoon that the lot further out, or the $1,000.00 one, would be the one which he thinks they

would prefer.    He desires that you signify your willingness to this price so that they can go ahead at once with temporary building.''  On November 5, 1911, Mr. Mann replied to the letter as follows: ''I have your letter of October 30th, 1911, regarding the Matthew Mann Estate lots in the town of Welch, and in reply would say that the figures suggested by you of $1,000.00, $1,500.00 and $2,000.00 respectively, are correct; and you are authorized to sell the lot on the alley, farthest from the Court House, with a frontage of fifty feet on Wyoming street and eighty feet on the alley, at One Thousand Dollars.  I am willing to make the terms satisfactory to the purchaser.''

It is not shown that Doctor Hatfield ever saw either of these letters or the sketch.  He says he never saw the letter and that he has no recollection of having seen the diagram.  Mr. Rhodes does not say he did.  His testimony is that he communicated the contents of Mr. Mann's letter to Doctor Hatfield, not that he read or exhibited it to him, and that he is not sure that he showed him the diagram, but says he is of the opinion that it was made at the time of their conversation and before the letter of October 30th, was written.  Both agree, however, that the prices of the lots were made known in some manner.

The exact date of the decision of the promoters to take Lot No. 4, the $1,000.00 lot, does not clearly appear.  Some of the oral testimony seems to place it after that of the letter of November 5th, but the correspondence seems to indicate that the choice had already been made when it took place.  However that may be, the choice was largly determined by the area of that lot.  At first, the four lots were supposed to be equal in point of area.  At least, the promoters so regarded them.  On investigation, however, they discovered that the original plat of the lot, gave it a frontage of eighty feet and a depth of one hundred and twenty five feet.  By survey, it was further discovered that its actual frontage was seventy feet.  The diagram made by Mr. Rhodes, gave each of the lots a frontage of fifty feet and a depth of eighty feet.  Mr. Mann says in his testimony he realized the diagram was incorrect, and that he never had any intention at any time to sell Doctor

Hatfield the entire lot. He further says it is his recollection that he told him he would not sell him the entire lot, but admits that he is not positive that, at their earlier conferences, they agreed on any certain number of feet. He says he understood only a small lot was desired. Dr. Hatfield is quite positive that, in his conversation with Mr. Mann about the lot, the size of it was never discussed. In one place, he says it was never discussed at all, and, in another, that he does not think it was ever discussed.

Under this open and indefinite contract for the purchase of a lot, the plaintiff, or its promoters, erected a temporary building on the portion of lot No. 4 which Mr. Mann says he agreed to sell for the purpose, early in November 1911. In the same year, they built a small coal house on the other portion thereof. Sometime in the year 1913, but, Col. J. J. Swope, plaintiff's manager, says, before they had any notice of the dispute as to the area of the lot, they built an addition to the building first put up, which extends over on to the disputed strip of twenty feet. After the controversy had arisen, sometime in the year 1914, they erected another building on the disputed strip, called the stock room.

In the mean time, a deed bearing date March 22, 1912, executed by the executors and trustees of the estate of Matthew Mann, and conveying to H. D. Hatfield a portion of lot No. 4, having a frontage of fifty feet on Wyoming Street and running back the full depth of the lot, 125 feet, to a fifteen foot alley, with the exception of a parallelogram in the northwest corner twenty-nine feet by thirty-five feet, claimed adversely by one Mrs. Effler, was deposited in the McDowell County National Bank for delivery on payment of $1,000.00. There is uncertainty as to the exact date of the origin of the controversy as to the size of the lot. Dr. Hatfield says he thinks a memorandum of data for the preparation of the deed, furnished to him by Col. Swope, was delivered to Judge J. French Strother, a stockholder, with directions to prepare a deed for the lot, and he thinks it was prepared, as directed, and that Mr. Mann refused to execute it on account of the dispute as to the description. He says he gave the controversy but little attention, because he was busy with other

matters and thought it would work itself out in the course of time.   He further says Mr. Rhodes told him there was another deed at the bank, evidently the one above described, and that he replied he would let him know about it later.

The Johnson Realty Company, plaintiff in the action of unlawful entry and detainer, seems to have purchased all of Block No. 2, of which lot No. 4 is a part, except the portion of said lot for which a deed was tendered by the executors to H. D. Hatfield.   The answer avers that the executors, on March 21, 1913, conveyed to the Johnson Realty Co. the twenty foot strip of Lot No. 4, which is in controversy, and the grantee in that deed denies possession of that portion of the lot by the plaintiff, at the date thereof.   But there is direct, positive and uncontradicted evidence that the coal house, at least, was built on the disputed strip, long before the purchase of the Johnson Realty Co., and the evidence tends to prove that the addition to the printing plant building, extending over on to that strip, was made before that conveyance.   Plaintiff's possession was manifestly sufficient to put the purchaser upon inquiry as to its title, which would have led to a full disclosure of such title as it had.   Such facts are the equivalent of full notice.

The exact status of Mr. Rhodes as agent need not be defined.   In some respects he was no doubt agent for each of them,—of Mann for some purposes and Hatfield for others. He made the inquiry as to prices for the latter.   He quoted the prices for the former.   For the former, he told the latter he could have the lot on the alley farthest from the court house for $1,000.00 and described it as having a frontage of 50 feet on Wyoming Street.   In making the sketch, representing it as having such dimension, he cannot be regarded as having been the agent of the latter, for he says nothing as to how he obtained the erroneous impression under which the incorrect representation was made.   He does not say he exhibited the paper to Dr. Hatfield after it was made and the latter has no recollection of ever having seen it.   Total lack of proof of any direction to make it or communication of data from which to prepare it, is obvious.   If Mr. Mann knew it was incorrect and intended to sell only a part of the lot, he utterly failed to

bring that fact to the attention of anybody. His letter indicated no purpose to sell only a part of the lot. On the contrary, it in terms proposed a sale of the lot and then misdescribed it as to its dimensions.

A lot in a town plat is an entity like a farm or tract of land and is usually dealt with as such. A sale of a farm or tract, by name or general description, is a sale in gross and the acreage is not the basis of the contract, even though it is mentioned by way of description. A sale of a lot the identity, location and dimensions of which are found in a town plat must be regarded in much the same way. It is not a sale by the front foot or by fractional part, unless the terms of the contract make it so. The parol evidence as well as the sketch shows all the parties knew there were four platted town lots in the block. Mr. Rhodes' letter asserts prices had been put on them as such, two years before the date thereof. His sketch showed no fractional lot, covered all the land in the block and fixed prices by the lot. His inquiry was for prices on them, and his sketch showed them occupying all the land between the two alleys. This inquiry was made by one of the promoters. So they understood there were four lots in the block. They said nothing about a division or purchase of a fraction. A special feature of the inquiry was as to the price of Lot No. 4, not by name, but by location, and it was responded to specifically. Nobody seems to have known it by number at that time. The sketch gave none of the numbers, nor did either letter mention a number. The request for the inquiry seems to have been made by location only. None of the parties seem to have had the plat before them or to have remembered the numbers. If they had had it, the descriptions would no doubt have been given by the numbers and it would have revealed the error as to the area of No. 4.

Though Rhodes may be regarded as having been a mere medium of communication, not an agent of either party, the vendor must be regarded as having spoken from the sketch and letter of Oct. 13th 1911, and they may be considered upon the inquiry for his meaning and intent as he expressed them, and it is that intent, not something he entertained but failed to express, that determines what the contract was, or whether

a contract resulted. So regarded, his letter must be taken to have related to Lot No. 4, not a fractional part thereof. Evidently he either did not know the size of the lot, or neglected to qualify his acceptance of the offer of purchase. He says he did know it, but he most assuredly failed to mention his intent to sell only a part, or to make known the departure of the sketch from the fact. Hence, he made the contract *under* a mistake as to the area of the lot or *by* mistake in the acceptance of the offer of purchase or grant of the option accepted by the vendees.

Proof of such a mistake does not negative the existence of a contract. Many of them are founded upon mistakes, but they are contracts nevertheless. In the legal sense of the terms, the minds of the parties met, notwithstanding the mistake. It is not the actual intent, but the expressed intent that determines such questions.

Mistakes under the influence of which parties make contracts, or mistakes in the formulation thereof, often afford ground for relief in equity. But to have such effect, the mistake, ordinarily, must be mutual or the mistake of one party must have been induced or caused by fraud on the part of the other. In either of these cases, a court of equity will rescind the contract. *Biggs v. Bailey,* 49 W. Va. 188; *Brown v. Rice,* 26 Gratt. 467; Kerr on Fraud, 413. A mistake made in the expression of the contract is alway fatal, for, in that case, the written contract is not the one actually made. Kerr on Fraud, 413. "If the mistake is not in the expression of the agreement, but in some fact materially inducing it, the mere knowledge in the one party of the mistake in the other, does not in the absence of a duty to disclose, or other special circumstances, constitute a sufficient ground in equity for avoiding it." Kerr, Fraud & Acc. 414. *Bank et al v. Campbell et al.,* 75 Va. 455. But in granting such relief, equity does not declare there was no contract. Its jurisdiction stands upon the assumption that there is one and is interposed to relieve from it.

In this respect, there is a marked distinction between equity jurisdiction to rescind a contract and jurisdiction to compel specific performance, founded upon the theory of discretion.

In the former case, the power of the court seems not to be discretionary, but, in the latter; it is to some extent at least. In the former, the injured party cannot, as a general rule, obtain any relief from his contract in a court of law. In the latter, he may recover damages for non-performance, and this right is the basis of the discretionary power of courts of equity to refuse specific performance, when applications are made to them for enforcement of hard or oppressive bargains.

A unilateral mistake, not induced by the opposite party, may, therefore, be sufficient to justify a court in refusing to decree specific performance of the contract. Pomeroy, Specf. Per., sec. 252; Kerr, Fraud & Mis. p. 411; *Halsey* v. *Monteiro,* 92 Va. 581. Whether the mistake developed here would justify the exercise of such discretion, it is unnecessary to decide, for a reason hereinafter to be stated.

The mistake did not warrant rescission of the contract, because it was purely unilateral. Neither the plaintiff nor its assignor or agent was in any way responsible for the terms of the letter of Nov. 5, 1911, or the message delivered under the authority it conferred. If the vendor intended to say something he did not say, or misapprehended the meaning of the words he used, that was his mistake. If he did not know the size of the lot, that was an oversight on his part for which the vendee was not responsible. If the promoters discovered the error, as to the size of the lot, there is no proof that they concealed their information from the vendors or did anything to hide the truth from them. Had they done so, their conduct might have afforded ground for absolute relief by way of rescission. *Bank et al.* v. *Campbell et al.,* 75 Va. 455.

The mistake, therefore, could only be relied upon in resistance of the application for specific performance, and as ground for an appeal to the discretion of the court. In the absence of part performance of the contract, it might be sufficient for that purpose. Whether it would or not, it is not necessary to say. The entry upon the land and improvement thereof create a powerful equity in the plaintiff, to which the court cannot shut its eyes. The vendors need not have admitted the vendees into possession, in advance of the execution of the deed. Having permitted them to enter and thus to

alter their position and situation to such an extent, by im-
provement of the lot and location of their business thereon,
that no legal remedy will adequately compensate for the
breach of the contract as made, the vendors are clearly estop-
ped from setting up their own mistake in resistance of com-
pletion of the contract.   Part performance, such as has taken
place here, creates an equity of such overpowering strength
that courts everywhere permit it to take verbal contracts out
of the statute of frauds, on the ground that the legislature
could never have intended it to operate in such cases, even
though they are within its letter.   And every legislative body
within the sphere of English civilization, from the British
Parliament down to that of the smallest territory, has ac-
quiesced in that interpretation.   Having such potency and
merit, it is surely sufficient to constitute an estoppel against
an equity, not at all relieving from the contract, but sufficient
only to induce a court of equity to remit the parties to their
legal rights.

The brief of the appellees suggests a variance of the evi-
dence from the bill as to the parties to the contract, but the
bill and the evidence taken altogether show the purchase was
made for the plaintiff company.

From the principles and conclusions here announced, it
results that the plaintiff has right to enjoin the prosecution of
the possessory action and also to have the contract of sale of
the lot specifically performed.   As the Johnson Realty Com-
pany purchased the twenty foot strip of Lot No. 4 and ob-
tained the legal title thereto, with notice of the plaintiff's
equitable title, it holds the legal title as a trustee for the plain-
tiff, wherefore it will be required to make conveyance thereof
to the plaintiff, with a covenant of special warranty.

As the contract was informal and indefinite and related to
so much of Lot No. 4 as belonged to the Matthew Mann estate,
the conveyance to be made by the executors and trustees of
that estate will omit the small parallelogram in the northwest
corner of the lot, held by Mrs. Effler under a claim of title by
adverse possession.

The decree complained of will be reversed, the injunction
reinstated and made perpetual, relief granted the plaintiff,

as above. indicated, and the cause remanded for execution of the decree here pronounced.

*Reversed and remanded.*